# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2802-19
            A-2805-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

M.K.F.,

      Defendant-Appellant/
      Cross-Respondent,

and

G.M.V.,

      Defendant,

and

R.B.,

      Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF K.M.V.

and J.L.V.,

　　　　Respondents/
　　　　Cross-Appellants,

and

Z.A.V., H.L.S.B., J.M.V., and
J.L.B., Minors.

_____

Submitted February 10, 2021 – Decided August 6, 2021

Before Judges Accurso, Vernoia and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0120-19.

Joseph E. Krakora, Public Defender, attorney for appellant/cross-respondent M.K.F. (Louis W. Skinner, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant R.B. (Kimberly A. Burke, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Mary L. Harpster, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for respondents/cross-appellants K.M.V. and J.L.V. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd Wilson, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors H.L.S.B., J.M.V. and J.L.B. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Linda Vele Alexander, Designated Counsel, on the brief).

PER CURIAM

Defendant M.K.F. (Meg) is the mother of six children: ten-year-old K.M.V. (Karen), nine-year-old Z.A.V. (Zack); seven-year-old J.L.V. (Jasmine), five-year-old J.M.V. (Jason), two-year-old J.L.B. (Jacob), and one-year-old H.L.S.B. (Heather).[1] Defendant G.M.V. (Greg) is the father of Karen, Zack, Jasmine, and Jason. Defendant R.B. (Randall) is the father of Jacob and Heather.

These consolidated appeals are from a guardianship judgment terminating Meg's parental rights to Karen, Jasmine, Jason, Jacob, and Heather, and Randall's parental rights to Jacob and Heather.[2] In A-2802-19, Meg appeals,

---

[1] We use fictitious names to protect the identity and privacy of the parties and because records relating to proceedings brought by the New Jersey Division of Child Protection and Permanency (the Division) pursuant to Rule 5:12 are not subject to public disclosure. R. 1:38-3(d)(12). We provide the ages of the children at the time of the 2020 guardianship trial.

[2] The judgment terminated Greg's parental rights to Karen, Jasmine, and Jason. Greg did not appeal from the judgment or participate in this appeal.

and the Law Guardian for Karen and Jasmine cross-appeals, from the judgment. In A-2805-19, Randall appeals from the judgment.

The judgment also dismissed the Division's complaint seeking the termination of Meg's and Greg's parental rights to Zack. The Division does not appeal from the dismissal.

Meg, Randall, and the Law Guardian for Karen and Jasmine contend the court erred by finding the Division clearly and convincingly satisfied the best-interests standard for termination of parental rights under N.J.S.A. 30:4C-15.1(a). The Division and the Law Guardian for Jason, Jacob, and Heather urge that we affirm the order. After reviewing the record in light of the parties' arguments, we conclude the court correctly applied the governing legal principles, and we affirm the termination of Meg's parental rights to Jason, Jacob, and Heather, and Randall's parental rights to Jacob and Heather. We also affirm the court's determination the Division clearly and convincingly established the first three prongs of the statutory best-interests standard for termination of Meg's parental rights to Karen and Jasmine. We further find that based on the trial evidence, the Division satisfied its burden of proving the fourth prong of the standard for termination of Meg's parental rights to Karen and Jasmine, but based on changes in circumstances subsequent to the guardianship

order, we vacate the order terminating Meg's parental rights to Karen and Jasmine and remand for reconsideration of whether termination of Meg's parental rights to those two children will not do more harm than good.

I.

The final guardianship order follows Meg's, Randall's, and the children's lengthy involvement with the Division.[3] We recount their history with the Division in detail to provide context for our discussion of the parties' respective arguments concerning the children's best interests and the guardianship order.

The Division's involvement with Meg and Greg began in 2011 when it received a referral that Meg physically assaulted ten-month-old Zack. During the Division's investigation, Meg reported she accidentally hit Zack in the face while attempting to hit Greg, who used Zack as a "shield." Meg admitted to marijuana use and explained she and Greg had a history of domestic violence.

The Division substantiated Meg for physical abuse, and offered services to Meg and Greg, including parenting classes, psychological evaluations, and substance abuse evaluations. The court granted the Division care and supervision of Karen and Zack and, a few days after Jasmine's birth in March

---

[3] We limit our discussion of the facts concerning Greg because he does not appeal from the judgment terminating his parental rights.

2012, the court also granted the Division care and supervision of Jasmine. The litigation was dismissed in August 2012.

Nineteen months later, the Division received a referral that two-week-old Jason had a fractured skull. The reporter stated the injury occurred when Greg left Jason on a bed, and then four-year-old Karen picked up Jason and dropped him on the floor. It was also reported Meg had received little prenatal care and she was observed at the hospital with bruises on her leg and jaw. Greg tested positive for marijuana use. In April 2014, the court awarded the Division care and supervision of Karen, Zack, Jasmine, and Jason.

In March 2015, the Division referred Meg for a substance abuse evaluation because she admitted to marijuana use when "stressed out." At that time, Meg also obtained a domestic violence restraining order against Greg and reported that Greg had previously physically assaulted her and threatened to kill her. Within two months, Meg dismissed the restraining order and was again living with Greg and the children.

During a June 2015 substance abuse evaluation, Meg admitted to using marijuana and Percocet, and she reported suffering from anxiety, depression, and other mental health issues. Meg began an intensive outpatient program, but was terminated from the program for noncompliance.

6

In August 2015, Meg and the children were evicted from their apartment due to nonpayment of rent. Meg and the children lived in a series of shelters and with various family and friends until April 2016. In November 2015, Greg punched Meg in the face, and she obtained a domestic violence temporary restraining order (TRO) against him. A final restraining order was entered in December 2015.

In March 2016, Meg was terminated from a substance abuse treatment program due to nonattendance. The following month, she asked the Division caseworker to "come get the kids" because she was denied welfare and did not have housing. Meg continued to move between the homes of family and friends, and she remained noncompliant with Division services.

Meg regularly interacted with Greg, leaving Jason with Greg even though the domestic violence final restraining order remained pending against Greg. In May 2016, Greg struck Meg in the face while she held Jason, and Greg threatened to shoot Meg with "guns in the house." Meg contacted the Division and requested that it "come get the children" because she was "overwhelmed."

7

The Division conducted a Dodd[4] removal of Karen, Zack, Jasmine, and Jason, and substantiated Greg for creating a substantial risk of injury to Jason. On May 24, 2016, the court granted the Division custody of the children. At the time of their removal, each of the children had lice; Jasmine had facial scars caused by Greg hitting her with a belt; Jasmine reported being hungry while in Meg's care because there was no food; it was necessary to remove a number of Karen's teeth because they were "rotten" and filled with cavities; and Karen and Zack had each missed more than thirty days of school since the beginning of the 2015-2016 school year.

At the resource home where they were placed, Karen and Jasmine fought each other. Karen and Jasmine qualified for in-home behavioral services and were placed in a therapeutic home on August 17, 2016. Much of their therapy focused on addressing trauma to which Meg and Greg exposed them.

During a June 2016 substance abuse assessment, Meg reported depression, anxiety, "[t]rouble controlling violent behavior," and having been previously diagnosed with bipolar disorder. Meg visited a psychiatrist for treatment of

---

[4] "A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82." N.J. Div. of Child Prot. & Permanency v. T.S., 463 N.J. Super. 142, 150 n.2 (App. Div. 2020) (quoting N.J. Div. of Youth & Fam. Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010)).

bipolar disorder and depression. The psychiatrist prescribed medication, but Meg later reported she stopped seeing the psychiatrist because she was pregnant and could not take the medication. The Division arranged for Meg to receive mental health treatment at another facility.

In July 2016, psychologist Dr. Leslie J. Williams conducted an evaluation and determined Meg was not "currently capable of providing adequate parenting to her children" because Meg did not comply with treatment recommendations and required psychological and substance abuse treatment. Meg was admitted to an outpatient treatment program in July 2016; terminated in August 2016 due to "sporadic[]" attendance; readmitted in January 2017; and terminated in April 2017 because she stopped attending treatment.

In February 2017, Meg reported she was pregnant and that Randall, who has a criminal history involving drugs and domestic violence, was the child's father.[5] In March 2017, Dr. Williams conducted a psychological evaluation of Randall and determined Randall was "not currently capable of providing adequate parenting to [Meg's] children." Dr. Williams found Randall had issues with anger, irritability, and control, and she recommended that he attend

---

[5] Meg did not report what occurred with the alleged pregnancy that she earlier claimed prevented her from taking the medication prescribed by the psychiatrist in June 2016.

A-2802-19

parenting classes and a substance abuse assessment. During the assessment, Randall reported he served two years in prison for assaulting the mother of his other children. Following a substance abuse assessment, Randall was not recommended for substance abuse treatment.

In March 2017, Meg began therapeutic visits with the children and parenting skills classes. She attended all the visits and two classes through May 2, 2017, but she then attended only one of the following nine parenting classes, and six of eleven visits with the children, through July 19, 2017.

Meg's poor attendance coincided in part with several domestic violence incidents. On May 1, 2017, Meg was treated in an emergency room for injuries sustained following a domestic violence incident with Randall. Meg agreed to meet with the Division's domestic violence liaison, but she missed the appointment and advised she did not need services because she was no longer dating Randall. Randall, who was on probation, was referred to an anger management program in which he enrolled and later completed.

The following month, Meg and Randall were involved in another domestic violence incident. They were each incarcerated as a result. Meg was released on June 21, 2017.

From July 20, 2017 through October 2, 2017, Meg attended every therapeutic visit with the children, but she did not participate in parenting classes. During this time, the supervisor of her visits with the children observed that Meg appeared "withdrawn" and often had "visible bruising," and that the children asked about Meg's injuries.

Meg gave birth to Jacob on October 13, 2017. Randall was incarcerated at the time as a result of a violation of probation. Eleven days later, the Division went to Meg's address and learned Meg's and Jacob's location was unknown. Meg spoke with a Division caseworker on October 25, 2017, and refused to provide Jacob's location. Two days later, the Division conducted a Dodd removal of Jacob and, on October 31, 2017, the court granted the Division custody of the child.

In November 2017, Meg underwent a substance abuse evaluation. It was not recommended that she undergo substance abuse treatment, but she was referred for mental health treatment.

Randall was released from incarceration in December 2017 and began visitation with Jacob.

The following month, Meg underwent a psychological re-evaluation with Dr. Elizabeth Stilwell. Randall accompanied Meg to the evaluation. Meg

A-2802-19

explained she participated in domestic violence counseling but stopped because she "didn't need it anymore." She also stated she did not comply with other services because "she did not feel like she needed them," and she no longer needed medication, in part, because her relationship with Randall improved her mood. Meg denied any domestic violence with Randall.

Dr. Stilwell expressed concern that Meg's relationship with Randall involved domestic violence and Meg was dependent on Randall for housing and financial stability. Dr. Stilwell determined Meg "ha[d] made very limited progress" and she "appear[ed] to lack the ability to adequately parent her five children and to protect them from harm." Dr. Stilwell recommended that Meg complete domestic violence counseling and a parenting skills program, obtain stable housing and income, participate in a substance abuse evaluation, and continue therapeutic visits with the children.

In late January 2018, the Division received a report that Karen took naked pictures of Jasmine. Karen and Jasmine later admitted they took pictures of their vaginas and learned to take the pictures from seeing their mother, Meg, take pictures of her vagina. According to the reporter, Karen and Jasmine said they saw Meg and her boyfriend having sex multiple times and that, during their visits with Meg, they saw pictures on Meg's cell phone of Meg having sex with her

12

boyfriend. Karen and Jasmine underwent psychosocial evaluations following the report.

In February 2018, the Division referred Randall to a batterer's intervention program and for parenting skills classes, and it referred the family to a program to address their housing needs. The program did not accept the family because Meg would not comply with the recommendation that she see a domestic violence liaison. Later, in October 2018, the Division wrote a letter on Meg's behalf to assist her in obtaining subsidized housing.

Randall went to a substance abuse assessment in February 2018. He reported having symptoms consistent with panic attacks and advised he was previously diagnosed with a mental illness but last took medication in December 2017. Randall was not recommended for substance abuse treatment, but it was observed that he "could benefit from grief counseling, healthy relationship skills, anger management [training], mental health assessment[s], complet[ing] probation[,] and maintain[ing] employment."

Dr. Stilwell conducted a psychological evaluation of Randall in March 2018. Randall did not believe he needed a batterer's intervention program; he said he would "do anger management because it's shorter." Randall reported he previously had been charged with domestic violence, but he denied physical

13

altercations with former paramours. He described his past behavior as "play fight[ing]," and he denied a history of domestic violence with Meg. He admitted, however, he "will grab [Meg's] wrists and arms" to calm her down. A few days prior to Dr. Stilwell's evaluation of Randall, Meg reported there was "a lot of domestic violence," and Randall "was trying to control her" and "threatened to kill her."

Dr. Stilwell found Randall's understanding of his previous domestic violence incidents and criminal charges "extremely concerning." Dr. Stilwell recommended that Meg and Randall be referred for a "more in-depth domestic violence risk assessment" and that Randall complete parenting skills classes. Randall agreed to participate in an anger management program, but he was closed out of the program because he did not attend.

In May 2018, Meg completed individual therapy. The therapy focused on addressing anger management, domestic violence, and parenting skills.

On May 30, 2018, the Division received a referral that Jasmine and Zack were found in bed together with no pants on. Karen witnessed the incident. Karen and Jasmine had already been referred for psychosocial evaluations because Karen had taken naked photographs of Jasmine. Zack was also referred for, and underwent, a psychosocial evaluation after this incident.

A-2802-19

Meg cancelled a June 5, 2018 visit with the children, claiming she suffered injuries—a black eye, and bruises and swelling of her hand and leg—in a car accident. Meg later admitted she lied about the car accident and that Randall injured her during a domestic violence incident. The Division advised Meg how to obtain a restraining order against Randall, and offered to meet with her to assist in obtaining a restraining order. Meg said she would obtain a restraining order, but she did not. Meg and Randall visited the children together on June 11, 2018 and July 3, 2018.

On June 26, 2018, Meg left a family team meeting after the Division raised the issue of the causes of Meg's bruising. Meg denied that Randall caused the injuries and accused the Division workers of making up stories. The Division provided Meg with a domestic violence liaison, but Meg consistently missed appointments with her.

During a July 24, 2018 visit with the children, Meg slapped Jasmine in the mouth because Jasmine "was not listening to her." Around this time, Randall stopped contacting the Division and stopped visiting the children. He also had several active warrants for his arrest.

In September 2018, Meg requested a Division referral for the housing program that had previously denied her application because she admitted to a

A-2802-19

history of domestic violence. The Division advised Meg the program might deny the application again because of her domestic violence history.

On September 26, 2018, the domestic violence liaison closed out Meg's case because she did not appear for her appointments. The liaison provided Meg with information concerning a domestic violence program. To the Division's knowledge, Meg never sought any domestic violence services.

On October 15, 2018, Dr. Thailyn Alonso conducted a psychological re-evaluation of Meg. During the evaluation, Meg said she did not believe she needed a domestic violence program, and she denied spending time with Randall. Meg acknowledged her children witnessed domestic violence incidents between her and Randall. Dr. Alonso observed Meg "demonstrated little to no insight regarding the risk and impact of domestic violence which is likely to continue to place her children's safety at risk." Dr. Alonso found there was an "ongoing" risk of domestic violence, the gains Meg made from services were "limited," and Meg was still not able to adequately parent her children.

By November 2018, Randall was in contact with the Division again; he completed an anger management program on November 14, 2018. Three weeks later, Dr. Carolina Mendez conducted a psychological evaluation of Randall. During the evaluation, Randall claimed his previous domestic violence charges

16

were "false accusations" and that he had been the victim of domestic violence. He said he did not need a batterer's intervention program, but he was participating in a batterer's intervention program because it would help him get his son back in his care.

Dr. Mendez found Randall "exhibit[ed] a pervasive pattern of denial, minimization, avoidance, and displacement of blame," and she opined that Randall "made very few gains in treatment." Dr. Mendez determined Randall would continue to engage in domestic violence, and that he needed to acknowledge his participation in domestic violence and accept responsibility for the harm he caused to others.

On December 7, 2018, officers arrested Meg and Randall. Meg had recorded a sexual encounter between her roommate and a male, and it resulted in a domestic dispute among Meg, Randall, and the roommate. Meg was arrested following the incident.

While at the Division's office on January 7, 2019, Meg yelled and cursed at Randall. A security guard intervened, and Randall left the office. Meg declined a caseworker's offer to speak to a domestic violence liaison. Three weeks later, Meg was arrested following a domestic violence incident during

which she reportedly struck Randall in the face and attempted to destroy a television.

On January 31, 2019, Meg and the children began family therapy. On February 4, 2019, Meg attended an intake for a program that offered anger management, individual therapy, parenting skills, and domestic violence classes. Several months later, in April 2019, the court ordered Meg to comply with the program. However, Meg did not comply, and her case with the program was closed.

In March 2019, Randall began participating in group therapy. Although Randall made progress over the course of several months, the program determined Randall needed more treatment because he was not as "forthcoming" with more difficult issues. Dr. Stilwell testified at trial the program was not appropriate for batterer's intervention.

On April 5, 2019, Randall obtained a TRO against Meg. He reported that three days earlier Meg first appeared at his job to harass him, and later struck his knee with her car.

On April 11, 2019, the Division filed a complaint for guardianship of Karen, Zack, Jasmine, Jason, and Jacob. The next day, Randall requested and

obtained the dismissal of his TRO against Meg. Around this time, Randall reported that he and Meg no longer lived together, but he paid for her rent.

In late April, Division caseworkers supervising Meg's visits with the children observed "an increase of negative behavior in visits" after the children learned about the Division's goal of adoption. The children's behavior sometimes "overwhelmed" Meg, which caused her to leave one visit early.

On May 2, 2019, Heather was born. On May 7, 2019, the Division obtained custody of Heather, and, six days later, the Division amended the complaint to also seek guardianship of Heather.

Around this time, Meg reported the building in which she resided was being foreclosed. Shortly thereafter, Meg advised Dr. Stilwell that she rented a first-floor apartment in exchange for acting as the superintendent of the building's exterior. However, Randall advised Dr. Stilwell he was the superintendent of the building and that Meg did not pay rent there.

During a May 21, 2019 visit with the children, Meg asked a caseworker in front of the children what she needed to do to surrender her parental rights, and she threatened not to attend the next visit.

In June 2019, Meg began attending individual therapy to address domestic violence, anger management, and parenting skills. Although she missed five of

the first nine sessions, she completed treatment in October 2019, and thereafter continued therapy for a period of time.

On July 26, 2019, the Division moved Heather into Jacob's resource home. On August 16, 2019, the Division placed Karen and Jasmine into a resource home committed to adoption.

During this time, Meg and Randall continued to visit the children. However, by September 2019, Randall's visits were inconsistent, and in November 2019, two months prior to the guardianship trial, Randall stopped attending the visits altogether.

During the guardianship trial, the Division presented its case through the introduction of voluminous records, and the testimony of caseworker Neury Trinidad, adoption supervisor Olga Fuentes, and Dr. Stilwell, who was qualified as an expert in psychology and bonding. The Law Guardian for Karen and Jasmine presented Karen and Dr. Karen Wells, an expert in psychology and bonding. We briefly summarize the witness testimony.

Trinidad testified concerning the Division's record-keeping and Meg's, Greg's, and Randall's respective histories with the Division. Trinidad explained that all the children, except Zack, were in adoptive homes, and that Karen, Jasmine, and Zack had indicated they preferred to be in Meg's care.

Trinidad also testified that, at the time of trial, Meg had appropriate housing and had provided the Division with a lease, but the Division was unable to verify the lease because Meg did not provide an updated lease with the new owners of the property in response to Trinidad's requests. Therefore, Trinidad was unable to confirm Meg would be able to stay in the housing in the long term. Trinidad further explained Randall's living situation was not known because he refused to provide the Division with his address.

Trinidad also noted Meg had been employed as a security guard for three months, but her employment had otherwise been unstable. Trinidad testified Randall's employment was "not stable" and that he had multiple changes in employment.

Fuentes testified concerning the Division's process for select home adoption for children who were not in adoptive homes but whose parents' parental rights were terminated. She explained the termination of parental rights to a child who was in a non-adoptive placement allowed the Division to explore additional placement options in and outside New Jersey because, prior to termination of parental rights, the Division is unable to share information concerning a child for the purpose of seeking possible adoptive select home placements.

21

Fuentes's testimony focused on Zack, who was not in a resource home committed to adoption at the time of trial. Fuentes explained in detail the Division's plan to place Zack in a home committed to adoption and his particular prospects for adoption based on his age and history of behavioral and other issues.

Dr. Stilwell testified she conducted psychological evaluations that included objective testing of Meg and Randall, and bonding evaluations with Meg, Randall, and their children, and the children and their resource parents.[6] She also explained the methodologies she employed to conduct the evaluations. Dr. Stilwell's most recent evaluations of Meg and the children occurred in June 2019, seven months prior to trial.

Based on her evaluations of Meg and Randall, Dr. Stilwell opined that, for reasons unique to each, neither parent is capable of adequately parenting their children at present or in the foreseeable future. She further determined the likelihood of Meg mitigating any parenting defects was "poor."

As the basis for her opinion concerning Meg, Dr. Stilwell considered Meg's history, including: her involvement with the Division since 2011, and that

---

[6] It does not appear Dr. Stilwell conducted a bonding evaluation with Zack and any resource parent.

A-2802-19

Meg's original involvement with the Division began with a referral that she struck then ten-month-old Zack in the face during a domestic violence incident with Greg. Dr. Stilwell also noted Meg's longstanding involvement with the Division; her history of failing to fully comply with services; her mental health history and inconsistent use of prescribed medications; her inability to maintain stable housing and employment; her lack of consistent visitation with the children; her domestic violence history; her history of dependence on Greg and Randall, with whom she had relationships characterized by domestic violence; her exposure of her children to domestic violence; her reliance on Greg and Randall for housing; and her ongoing minimization of her domestic violence history and the domestic violence that occurred in her relationships with Greg and Randall. Dr. Stilwell found Meg's failure to consistently visit the children and attend recommended programs demonstrated Meg's instability and that Meg would be unable to ensure the children were taken to appointments and activities. Dr. Stilwell testified Meg's failure to comply with services demonstrated a lack of motivation to address the issues that led to the children's removal from her care and custody.

Dr. Stilwell further explained the children have emotional and behavioral issues that will place "a high level of demand" on a parent, and that Meg has

23

expressed she is "overwhelmed" with the children during her visits with them. In Dr. Stilwell's opinion, those facts in part establish Meg would have difficulty caring for the children. Dr. Stilwell further opined Meg had not benefitted from programs and services provided to address her deficiencies and needs.

Dr. Stilwell testified Meg's lack of insight prevents Meg from changing her behavior and, as a result, Meg will repeat the behavior that led to the removal of the children. Based on her testing and evaluation of Meg, Dr. Stilwell opined that Meg lacks the psychological resources to meet the children's needs for protection, safety, nurturing, and guidance, and Meg is not likely to change in the foreseeable future.

Dr. Stilwell explained that Meg's long history of failing to obtain the benefits of services resulted in an inability to mitigate the risks of harm to the children through any meaningful change in her behavior. Dr. Stilwell testified Meg's domestic violence history and her involvement with paramours who committed acts of domestic violence caused harm to the children, who were exposed to the domestic violence, and presented a risk of future harm because Meg had not benefitted from the services provided over many years to mitigate the risk that she would continue her involvement in relationships characterized by domestic violence. Dr. Stilwell also explained that Meg's housing and

24

employment instability, and other issues, rendered her unable to safely parent the children, and caused the children harm by denying them opportunities for permanency.

Dr. Stilwell further explained termination of Meg's parental rights would not do more harm than good. She found that although each of the children had positive relationships with Meg, it was unlikely that they had secure attachments to her because of her inconsistent visits and the amount of time they spent outside of her care.

Dr. Stilwell also testified it was unlikely the older children, Karen, Jasmine, and Zack, had secure attachments based on the time they had actually lived with Meg because of the traumas they experienced under her care. Dr. Stilwell testified the children would suffer some harm if Meg's rights were terminated, but the harm would not be significant or enduring and that any harm would be mitigated by providing the children with secure and stable environments.

Dr. Stilwell testified she found Randall's criminal history and minimization and denial of his involvement with the Division were "significant" in her determination Randall would not be able to safely parent. Dr. Stilwell observed Randall was physically violent, and coercive and controlling towards

Meg, but he either denied or minimized his domestic violence history with Meg and others. Dr. Stilwell observed Randall continued to coerce and control Meg even after they separated. Dr. Stilwell found Randall's reports concerning his history of domestic violence contradicted the record and Meg's statements, and he lacked the insight necessary to address the issues that led to the removal of the children from his care. Dr. Stilwell also noted Randall's refusal to provide his address as evidence of his housing instability.

Based on objective testing and her interview of Randall, Dr. Stilwell found he had psychological traits—including his minimization of his domestic violence history, his lack of empathy for the children, and his primary focus on himself—that impair his ability to parent Jacob and Heather. Dr. Stilwell opined Randall lacks the psychological and physical resources to provide for his children's protection, safety, nurturing, and guidance at present and in the foreseeable future. She concluded that termination of his parental rights to Jacob and Heather would not do more harm than good.

During Dr. Stilwell's bonding evaluations of Karen and Jasmine with Meg, Karen stated she preferred to live with Meg if Meg obtained housing. Jasmine advised Dr. Stilwell she wanted to stay with her resource parents. Dr. Stilwell opined that Karen and Jasmine each had an "insecure" attachment to Meg, and

neither child viewed Meg as a parental figure. Dr. Stilwell also found that although Karen and Jasmine had resided with their resource parents for only a few months prior to the evaluation, the children enjoyed a healthy relationship with them, and the consistency and stability they provided would mitigate any disruption to the children that termination of Meg's parental rights might cause.

Dr. Stilwell opined that Jason had an attachment to Meg, but he did not see her as a parental figure. Meanwhile, Dr. Stilwell testified Jason had a secure attachment to his resource parents, who he viewed as his parents, and that Jason would suffer severe and enduring harm if his relationship with his resource parents was severed.

Dr. Stilwell further testified that Jacob had a secure attachment to his resource parent, who has provided him with care, nurturing, and support for almost the entirety of his life. Dr. Stilwell explained that Jacob viewed his resource parent as his primary caregiver, attachment figure, and psychological parent, and that severing his relationship with his resource parent would cause him severe and enduring harm. In contrast, Dr. Stilwell opined that Jacob did not have a secure attachment with either Meg or Randall, and that any disruption caused by the termination of their parental rights to him would not result in severe or enduring harm to the child.

27

Dr. Stilwell opined Heather would experience "very minimal" disruption if Meg's and Randall's parental rights were terminated because Heather was too young to have formed any attachments with them. Dr. Stilwell further explained that none of the children would suffer significant or enduring harm from the termination of either Meg's or Randall's parental rights, and any harm they might suffer would be mitigated by their placements in, or continued placements in, stable and secure homes.

During cross-examination, Dr. Stilwell was asked why she did not update her report during the nine-month period following her evaluations and the guardianship trial. Dr. Stilwell explained she was not asked to update her report, but she did review and consider new information prior to her trial testimony. The information pertained to Meg completing services and obtaining employment following Dr. Stilwell's evaluations.

Dr. Stilwell testified the new information did not alter her opinions concerning Meg's inability to parent the children. For example, Dr. Stilwell opined that Meg did not benefit from completion of services because she continued to have a relationship with and rely on Randall. Dr. Stilwell was not persuaded the new information established Meg benefitted from the treatment because no one had observed any actual change in Meg's behavior and Meg had

28

a history of providing inconsistent narratives to service providers. Dr. Stilwell further noted the clinician who oversaw Meg's most recent treatment may not have been aware of Meg's history.

Called by her Law Guardian, then ten-year-old Karen testified at trial that she did not want to be adopted. Instead, she preferred to live with Meg.

The Law Guardian for Karen and Jasmine also called Dr. Wells, who testified as an expert in psychology and bonding. She performed a psychological evaluation of Meg, and bonding evaluations with Meg and the children, and Karen and Jasmine and their resource parents.

During her Dr. Wells' evaluation, Meg minimized her domestic violence history and provided information that was inconsistent with prior reports Dr. Wells reviewed. Meg repeated versions of events that she had previously acknowledged were untrue. Dr. Wells found Meg had "an underdeveloped appreciation of the difficulties her children endured while in her care as a result of domestic violence, transience, and uncertainty."

Dr. Wells found Meg "continue[d] to demonstrate characteristics indicating that she is neither emotionally nor psychologically equipped to address the day-to-day demands of attending to herself, managing the home, and responding to the educational, social, emotional, [and] psychological needs

A-2802-19

presented by" Karen, Zack, and Jasmine.  Dr. Wells found the children did not view Meg as their primary caretaker, the bond between Meg and the children was insecure, and reunification was "clinically contraindicated."

Dr. Wells found, however, that termination of Meg's parental rights would cause irreparable and enduring harm to the children, and she recommended that the permanency offered by a guardianship order should be delayed for nine months to permit Meg an opportunity to further take advantage of services.  Dr. Wells acknowledged the children had suffered, and would continue to suffer, harm from their lack of permanency during the nine-month period she suggested.

Subsequent to the closing arguments of counsel, the court issued a thorough written decision summarizing the evidence and detailing its findings of fact and conclusions of law based on the evidence presented concerning each child.  The court found the Division clearly and convincingly established each of the four prongs of the best-interests-of-the-child statutory standard, N.J.S.A. 30:4C-15.1(a)(1) to (4); see also N.J. Div. of Youth & Fam. Servs. v. A.R., 405 N.J. Super. 418, 443 (App. Div. 2009) (noting "the four prongs must be evaluated separately as to each child"), and, in pertinent part, concluded termination of Meg's parental rights is in the best interests of Karen, Jasmine, Jason, Jacob, and Heather, and found termination of Randall's parental rights is

30

in Jacob's and Heather's best interests.[7]  The court also found the Division failed to sustain its burden of establishing it was in Zack's best interest to terminate Meg's parental rights.  The court entered a February 25, 2020 guardianship order reflecting its decision.  These appeals and the cross-appeal followed.

Subsequent to the submission of the parties' merits briefs, the Law Guardian for Karen and Jasmine submitted letters to this court advising that Karen's and Jasmine's placements had changed following entry of the guardianship judgment.[8]

The letters explained that on March 2, 2020, Karen and Jasmine were placed together in a resource home different from the one in which they had been residing at the time of trial.  Karen was subsequently removed from the new resource home on December 15, 2020, and, the following day, was moved to a non-adoptive treatment home.

Meg moved before this court to: supplement the record with the Law Guardian's three letters; vacate the guardianship judgment's termination of her

---

[7]  As noted, the court also found it was in Karen's, Jasmine's, and Jason's best interests to terminate Greg's parental rights to them.  The court also found the Division failed to clearly and convincingly establish grounds supporting the termination of Greg's parental rights to Zack.

[8]  Two letters are dated September 30, 2020, and one letter is dated December 21, 2020.

parental rights to Karen and Jasmine; and remand the matter for the trial court to reconsider its determination of prong four of the best-interests standard as to Karen and Jasmine based on their changed placements.[9] The Division filed opposition to Meg's motion, arguing the information concerning Karen's and Jasmine's changed placements did not warrant a remand for reconsideration of the guardianship judgment. Because the motion was submitted to the court just prior to the scheduled calendar date, we deemed it appropriate to decide the motion in the context of our consideration of the parties' arguments on appeal.

We grant the motion to supplement the record with the three letters. They were submitted in accordance with the requirement that parties advise this court by letter of "any change in the placement status of [a] child during the pendency of [an] appeal" from a guardianship matter, R. 2:6-11(f), and none of the parties dispute the accuracy of the information in the letters. In our discussion of the merits of the appeals and cross-appeal, we address Meg's motion to vacate the guardianship order as to Karen and Jasmine and for a remand for the court to reconsider whether termination of Meg's parental rights will do more harm than good under the fourth prong of the best-interests-of-the-child statutory standard, N.J.S.A. 30:4C-15.1(a)(4).

---

[9] Meg's motion to supplement the record is docketed as M-2543-20.

II.

"[P]arents have a constitutionally protected, fundamental liberty interest in raising their biological children." N.J. Div. of Youth & Fam. Servs. v. T.S., 417 N.J. Super. 228, 240 (App. Div. 2010) (citation omitted). "Th[is] fundamental parental right, however, is not without limitation." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 102 (2008). The State, as parens patriae, has a "responsibility to protect the welfare of children." In re Guardianship of J.N.H., 172 N.J. 440, 471 (2002). Thus, "[w]hen the safety and welfare of a child become so irredeemably jeopardized by parental abuse or neglect, the State may take the most extreme form of action, which is to completely sever the relationship between a mother or father and a child." E.P., 196 N.J. at 102.

We first summarize the well-established principles that guide our review. To determine whether termination of parental rights is appropriate, a court will apply the "best interests of the child" standard. T.S., 417 N.J. Super. at 241. Under the standard, a court may terminate a person's parental rights if the Division establishes by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his [or her] resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a); see also E.P., 196 N.J. at 103.]

The four prongs of the standard require a fact-sensitive analysis, and "are neither discrete nor separate. They overlap to provide a composite picture of what may be necessary to advance the best interests of the children." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 280 (2007) (quoting N.J. Div. of Youth & Fam. Servs. v. F.M., 375 N.J. Super. 235, 258 (App. Div. 2005)); see also In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999).

"[T]he scope of [our] review of a trial court's decision to terminate parental rights is limited." T.S., 417 N.J. Super. at 240. A reviewing court "will not disturb the family court's decision to terminate parental rights when there is

substantial credible evidence in the record to support the court's findings." E.P., 196 N.J. at 104. Generally, we will defer to the trial court's factual findings "because it observed the witnesses, weighed their credibility, and had the best '"feel" of the case.'" M.M. 189 N.J. at 293 (citation omitted). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." E.P., 196 N.J. at 104 (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)). We review a trial court's legal interpretations de novo. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014).

On appeal, Meg argues for the first time the court erred by relying on Dr. Stilwell's expert opinion, which Meg contends constituted an inadmissible net opinion. Meg, Randall, and the Law Guardian for Karen and Jasmine further claim the court erred by finding it was in the best interests of the children to terminate parental rights. Meg challenges the court's findings as to prongs one, two, and four; Randall challenges the court's findings as to all four prongs; and the Law Guardian challenges the court's findings as to prongs two, three, and four.

A-2802-19

A.

We first consider Meg's contention that the court erred by considering and relying on Dr. Stilwell's opinion because it constituted an inadmissible net opinion. We reject the argument for two reasons. First, Meg failed both to move to bar Dr. Stilwell's testimony prior to trial or object to her testimony based on a contention Dr. Stilwell offered an inadmissible net opinion. We generally do not consider an argument raised for the first time on appeal, see State v. Robinson, 200 N.J. 1, 20 (2009); Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973), and we reject Meg's claim for that reason alone. Moreover, and for purposes of completeness, we find no merit to Meg's argument.

"N.J.R.E. 703 'addresses the "bases of opinion testimony by experts."'" Polzo v. Cnty. of Essex, 196 N.J. 569, 582 (2008) (quoting State v. Townsend, 186 N.J. 473, 494 (2006)). The rule requires that an expert's opinion be based on "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts." Townsend v. Pierre, 221 N.J. 36, 53 (2015) (quoting Polzo, 196 N.J. at 583).

A "corollary" of N.J.R.E. 703 is the "net opinion" rule, which prevents the admission of an expert's opinion into evidence when the opinion is not supported by facts or data. Ehrlich v. Sorokin, 451 N.J. Super. 119, 134 (App. Div. 2017). "A net opinion is 'a bare conclusion unsupported by factual evidence.'" Ibid. (quoting Creanga v. Jardal, 185 N.J. 345, 360 (2005)). Thus, for an expert's opinion to be admissible, the "expert must '"give the why and wherefore" that supports the opinion, "rather than a mere conclusion."'" Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011)). "[E]xperts [must] 'be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable.'" Townsend, 221 N.J. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)).

Here, Dr. Stilwell explained in detail the facts supporting the opinions she offered concerning Meg's parenting, psychological, and behavioral issues; the bonds between Meg and her children, and the children and their respective resource parents; and Meg's inability to safely and securely parent her children. The facts were properly gleaned from Division records; Dr. Stilwell's psychological and bonding evaluations; Dr. Stilwell's observations of Meg, the

children, and the resource parents; Meg's statements; and other records admitted in evidence. Dr. Stilwell detailed the objective tests she employed to assess Meg's psychological issues and the methodology she employed to form the opinions she related during her testimony. Dr. Stilwell further testified that the methodology she employed to evaluate Meg and Randall, and to conduct her bonding evaluations, was in accord with accepted standards in her areas of expertise. Contrary to Meg's conclusory assertions, Dr. Stilwell provided the "why and wherefore" of her opinions, which the court properly admitted and accepted. See Borough of Saddle River, 216 N.J. at 144 (quoting Pomerantz Paper Corp., 207 N.J. at 372).

Meg also argues Dr. Stilwell's testimony should not have been admitted because Dr. Stilwell did not consider Meg's completion of a program in her assessment of Meg's parenting ability and prospect for safely parenting the children in the future. Meg completed a program subsequent to the psychological evaluation upon which much of Dr. Stilwell's opinion testimony was based, but at trial Dr. Stilwell addressed Meg's participation in the program and explained in detail why it did not change her opinions concerning Meg's parenting ability or prospects for parenting in the future.

A-2802-19

An expert's testimony is not "inadmissible merely because it fails to account for some particular condition or fact which the adversary considers relevant." Fin. Servs. Vehicle Tr. v. Panter, 458 N.J. Super. 244, 259 (App. Div. 2019) (quoting State v. Freeman, 223 N.J. Super. 92, 116 (App. Div. 1988)). "The expert's failure 'to give weight to a factor thought important by an adverse party does not reduce his [or her] testimony to an inadmissible net opinion if he [or she] otherwise offers sufficient reasons which logically support his [or her] opinion.'" Townsend, 221 N.J. at 54 (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 402 (App. Div. 2002)). Rather, an expert's alleged failure to consider or give appropriate weight to a factor goes to the "weight or persuasiveness" a fact finder should attribute to the opinion. Fin. Servs. Vehicle Tr., 458 N.J. Super. at 259.

The fact that Dr. Stilwell did not modify her evaluation of Meg prior to trial to address Meg's completion of a program did not render Dr. Stilwell's testimony inadmissible. See Townsend, 221 N.J. at 54. The court appropriately admitted Dr. Stilwell's expert opinion testimony and gave it the weight to which the court reasonably determined it was entitled. We reject Meg's claim to the contrary.

 A-2802-19

B.

Meg and Randall contend the court erred by finding the Division presented sufficient evidence satisfying its burden under the first prong of the best-interests standard. The Law Guardian for Karen and Jasmine does not make a similar claim. The Division and the Law Guardian for Jason, Jacob, and Heather argue the Division presented clear and convincing evidence satisfying its burden as to Meg and Randall as it applies separately to them and each of the children.

To satisfy its burden under the first prong, "the State [must] demonstrate harm to the child by the parent," which, "in this context, involves the endangerment of the child's health and development resulting from the parental relationship." K.H.O., 161 N.J. at 348. The focus is not on a "single or isolated harm," but "on the effect of harms arising from the parent-child relationship over time on the child's health and development." Ibid. Prong one "addresses the risk of future harm to the child as well as past physical and psychological harm." N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 222 (App. Div. 2013). "Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999).

The harm may be established by "a delay in establishing a stable and permanent home." Ibid. "A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." Id. at 379 (citing K.H.O., 161 N.J. at 352-54). Additionally, a parent's "persistent failure to perform any parenting functions and to provide . . . support for [the child] . . . constitutes a parental harm to that child arising out of the parental relationship [that is] cognizable under N.J.S.A. 30:4C-15.1(a)(1) and (2)." Id. at 380-81. Moreover, "prolonged inattention by natural parents that permits the development of disproportionately stronger ties between a child and [resource] parents may lead to a bonding relationship the severing of which would cause profound harm—a harm attributable to the natural parents . . . ." In re Guardianship of J.C., 129 N.J. 1, 18 (1992).

Here, the record supports the court's finding Meg and Randall have harmed and will continue to pose a risk of harm to their respective children. As the trial court explained in detail, Meg has a significant and consistent history of relationships characterized by domestic violence with her paramours. During her relationships with the fathers of her children, Greg and Randall, Meg committed acts of domestic violence and was victimized by their acts of domestic violence. Some of the children have witnessed acts of domestic

41

violence, as well as the injuries Meg suffered over the years as a result of domestic violence.

The evidence further showed the Division first became involved with Meg in 2011, when Zack was injured during a domestic violence incident between Meg and Greg, and Randall has a criminal history related to acts of domestic violence against other paramours prior to his relationship with Meg.

Additionally, following years of attempts to provide services for Meg and Randall to address their respective issues with domestic violence, they were involved in a domestic violence incident with each other and a third party just a few months prior to the guardianship trial. At various times, Meg and Randall have rendered themselves unavailable to care for the children because they have been incarcerated following arrests resulting from domestic violence incidents.

The evidence establishing Meg's and Randall's respective histories of domestic violence, their ongoing interdependent relationship, and Meg's history of relying on Greg and Randall for housing, amply supports the court's determination Meg and Ryan have harmed, and continue to pose a risk of harm to, their respective children under N.J.S.A. 30:4C-15.1(a)(1). The harm, and continued risk of harm, is further established by the unrebutted expert testimony of Dr. Stilwell, who explained that the children's past exposure to domestic

violence, and the risk of exposure to future acts of domestic violence by Meg and Randall, results in harm to the children and the risk of future harm.[10] See N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 491 (App. Div. 2016) (explaining expert testimony may establish a child suffers harm from exposure to domestic violence). Moreover, neither Meg nor Randall have adequately addressed the issues that separately cause them to engage in acts of domestic violence, and, as a result, it can be reasonably anticipated they will continue to engage in the domestic violence that has characterized their respective histories. See N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 450-52 (2012) (finding a mother presented a risk of harm to her children when she continued to have a relationship with a father who committed domestic violence against her and she refused to seek treatment for her mental illnesses and other parental deficits).

The risk of harm Meg and Randall separately pose to their respective children was further established by the unrebutted testimony of Dr. Stilwell. She

---

[10] There is evidence Karen, Jasmine, and Jason actually witnessed acts of domestic violence. There is no evidence Jacob and Heather witnessed acts of domestic violence, but, as noted, Meg and Randall pose an ongoing risk exposing them to domestic violence due to their domestic violence histories and their failures to address the issues giving rise to their proclivities to engage in domestic violence against each other and their paramours.

A-2802-19

explained Meg and Randall both suffer from unresolved psychological issues that render them incapable of providing a safe and secure home for the children. Dr. Stilwell opined that Randall lacks the psychological and physical resources to provide for the protection, safety, nurturing, and guidance of the children. Dr. Stilwell noted Meg lacked insight into the reasons for the removal of her children; Meg was emotionally overwhelmed when the demands of parenting were placed on her; and Meg relied on paramours who, due to domestic violence issues, present a risk to the children. Dr. Stilwell further opined Meg lacked the psychological resources to meet her children's needs for safety, protection, and guidance. Dr. Wells agreed; she opined Meg was presently incapable of safely parenting her children.

Meg's and Randall's respective issues as detailed by Dr. Stilwell, as well as their inability to provide housing for their children during the course of their involvement with the Division, also delayed permanency for each child. Their persistent and lengthy failures to fulfill their roles and responsibilities to provide their children with the safe and secure home, guidance, and nurturing every child deserves "constitutes a parental harm" to each of their children that is "cognizable under" the first prong of the best-interests standard. D.M.H., 161 N.J. at 380-81. As the trial court correctly found, Meg's and Randall's respective

failures to address the issues that have rendered them each unable to safely parent their children also caused harm, and present a continuing risk of future harm, by delaying each child's right to permanency. See id. at 383 (explaining a parent's delay in providing a "stable and permanent home" constitutes harm under the first prong of the best-interests standard). That harm alone also supports the court's finding the Division clearly and convincingly satisfied its burden under N.J.S.A. 30:4C-15.1(a)(1).

C.

Under the second prong, the Division must establish "[t]he parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). This prong "is aimed at determining whether the parent has cured and overcome the initial harm that endangered the health, safety, or welfare of the child, and is able to continue a parental relationship without recurrent harm to the child." K.H.O., 161 N.J. at 348. Prong two "can be satisfied by establishing that a parent is unable to protect a child from the dangers posed by another parent." F.M., 211 N.J. at 451-52 (finding the Division established prong two when a parent recanted instances of domestic violence and denied being in a relationship

A-2802-19

with a partner who refused to treat his substance abuse issues and mental illness); see also N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 617-18, 623 (App. Div. 2007) (holding the Division established prong two as to one child when the parents refused to acknowledge their role in the unexplained trauma experienced by that child under their care). The Division may also prove prong two by establishing "the parent is unable to provide a safe and stable home for the child and that the delay in securing permanency continues or adds to the child's harm." K.H.O., 161 N.J. at 348-49.

We agree with the court's finding the Division presented clear and convincing evidence Meg and Randall are either unwilling or unable to address and correct the issues that resulted in the removal of their respective children. Meg argues the court erred because the evidence showed she completed some services following Dr. Stilwell's evaluation, and that Dr. Stilwell failed to consider the progress she made in completing the services in her evaluation of Meg. We are not persuaded.

Meg does not dispute that over the many years she has been involved with the Division she has been offered innumerable and varied services directed to addressing the issues that resulted in the removal of her children. The record shows, however, her compliance with services has been inconsistent. For

example, she consistently failed to utilize the domestic violence liaison that was offered on many occasions, and she continued to minimize the harm to the children posed by her unresolved issues related to domestic violence, both as a victim and as a perpetrator. Meg also ignores that Dr. Stilwell addressed Meg's completion of some services prior to the trial, but discounted the importance of the completion because of Meg's long history of not benefitting from services that were provided. See, e.g., N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 484 (App. Div. 2012) (explaining a parent's long-term effort to gain the ability to safely parent his or her child must yield "to an expeditious, permanent placement to promote the child's well-being"). The court had the benefit of the evidence demonstrating Meg's completion of services and Dr. Stilwell's testimony concerning how the completion of services did not change her assessment of Meg. The court accepted as credible Dr. Stilwell's testimony that although Meg completed some services, she continued her reliance on Randall, and the evidence otherwise established she is unable to safely parent her children. We defer to the court's credibility determination and findings of fact because they are supported by evidence the court deemed credible. See E.P., 196 N.J. at 104.

Furthermore, the court's findings on prong two as to Meg and Jason and Jacob are further supported by Dr. Stilwell's unrebutted testimony that the children would suffer severe and enduring harm if their relationships with their respective resource parents were severed. See L.J.D., 428 N.J. Super. at 494 (finding an expert's testimony that a child's separation from his resource parents would cause him "serious and enduring emotional harm" sufficiently satisfied prong two).

Randall argues he completed an anger management program and a batterer's intervention program, provided housing for Meg that was suitable for the children, and had employment and plans for future employment. He contends that, for those reasons, the court erred by finding he was unwilling or unable to eliminate the harm to Jacob and Heather. Again, we are not persuaded.

We agree with the Division and the Law Guardian for Jason, Jacob, and Heather that there is substantial credible evidence supporting the court's determination that Randall is unwilling or unable to provide the children with a safe and stable home and the delay of permanent placement will add to the harm. As the trial court found, Randall's long history of domestic violence with others and Meg posed an ongoing risk to his children that he consistently minimized and failed to address. He advised Dr. Stilwell he did not need a batterer's

intervention plan but would participate in an anger management class because it was "shorter." He denied domestic violence incidents with Meg, even though she had visible injuries she attributed to him, and he described domestic violence incidents in his past as "play fight[ing]." He reported completing a batterer's intervention program, but Dr. Stilwell testified the program was a general therapy program, not a batterer's intervention program.

Again, the court found Dr. Stilwell's testimony credible, and accepted her opinion that Randall posed a risk of continuing domestic violence because he had failed to acknowledge his domestic violence history or adequately complete services that resolved the issues causing his violence against Meg and others. Dr. Stilwell further testified Randall's psychological traits and issues render him incapable of providing Jacob and Heather with the protection, safety, guidance, and nurturing of a capable parent. That testimony is unrebutted.

Dr. Stilwell's testimony supports the court's finding on the second prong of the best-interests standard. Randall is incapable of parenting the children, and his continued resort to domestic violence, and his lack of acknowledgment of it even after receiving treatment, establishes Randall is unwilling or unable to eliminate the harm to Jacob and Heather. See, e.g., N.J. Div. of Youth & Fam. Servs. v. L.M., 430 N.J. Super. 428, 444 (App. Div. 2013) (finding a

parent's continued drug use, failure to attend treatment, and inability to seek appropriate housing all posed a risk to her children); N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 592 (App. Div. 1996) (finding a parent's "inability or unwillingness to resolve the problems with respect to her mental health and substance abuse" satisfied the second prong of the best-interests-of-the-child standard).[11]

## D.

Prong three requires that the Division demonstrate it "made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home," and that the court "consider[] alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). Prong three "contemplates efforts that focus on reunification." K.H.O., 161 N.J. at 354. The services offered must be reasonable under the circumstances and tailored to the needs of each parent. D.M.H., 161 N.J. at 390. However,

_____

[11] We also note Dr. Stilwell's unrebutted testimony that Jacob would suffer severe and enduring harm if separated from his resource parents, supports the court's finding of prong two as to Jacob. See L.J.D., 428 N.J. Super. at 494. The evidence further established Randall had an unstable employment history, and the status of his housing situation could not be assessed because he would not provide the Division with his address.

"[e]xperience tells us that even [the Division's] best efforts may not be sufficient to salvage a parental relationship." F.M., 211 N.J. at 452.

The record supports the court's conclusion the Division provided "a plethora of services to" Meg and Randall in addressing their respective circumstances and issues that led to the removal of their children from their respective care and custody. Additionally, the Division "assessed several relatives for placement," and none provided an alternative to termination of Meg's and Randall's parental rights to the children.

Meg does not dispute the Division satisfied its burden of proving it provided reasonable services to her. Randall asserts the Division failed to provide reasonable services to assist him in finding suitable housing and insufficient time with his children to develop a bond. We find the argument lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

We note only that the Division offered Randall innumerable services, many of which he either refused or failed to complete. The Division also referred Randall to a service for housing, but he was rejected because of his domestic violence history. Randall was also rejected by another housing service because he was not homeless and his income exceeded the qualification limit,

51

which meant he was ineligible for the service. Randall also advised the Division he resided with his girlfriend, but he refused to provide an address, and there were periods of time he did not remain in contact with the Division. Randall's claim the Division did not offer him sufficient time with Jacob and Heather is belied by his inconsistent attendance at the visitations the Division arranged, and his failure to attend any of the visitations with the children in the months immediately preceding the guardianship trial.[12]

E.

Meg and Randall argue the guardianship order should be reversed because the Division failed to clearly and convincingly prove termination of their respective parental rights will not do more harm than good. The Law Guardian for Karen and Jasmine similarly contends the court erred by finding the Division satisfied its burden under the fourth prong of the best-interests standard. The

---

[12] We need not address the argument made by the Law Guardian for Karen and Jasmine that the Division failed to inform the children's resource parents of the option to care for the children as kinship legal guardians instead of through adoption. The record lacks evidence establishing the resource parents had the "biological, legal, extended or committed emotional or psychological relationship with" the children that is required for a kinship legal guardianship. N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 260 (App. Div. 2019) (quoting N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 508 (2004)). Additionally, the issue is moot because Karen and Jasmine are no longer with the resource parents with whom they resided, and who were committed to adoption, at the time of the guardianship trial.

A-2802-19

Law Guardian for Jason, Jacob, and Heather asserts the Division presented ample evidence supporting the court's determination. In our consideration of the arguments presented, we separately consider, as we must, the evidence presented as to each child and each parent. See M.M., 189 N.J. at 288 ("Parental rights are individual in nature and due process requires that fitness be evaluated on an individual basis."); see also A.R., 405 N.J. Super. at 443 (observing "the four prongs must be evaluated separately as to each child").

"[T]he fourth prong 'serves as a fail-safe against termination even where the remaining standards have been met.'" R.G., 217 N.J. at 559 (quoting E.P., 196 N.J. at 108). It "requires that [the Division] prove by clear and convincing evidence that '[t]ermination of parental rights will not do more harm than good.'" N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 180-81 (2010) (second alteration in original) (quoting N.J.S.A. 30:4C-15.1(a)(4)). In deciding if the Division has proved prong four, the court must determine "whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with [his or] her natural parents than from the permanent disruption of [his or] her relationship with [his or] her [resource] parents." K.H.O., 161 N.J. at 355; see also F.M., 211 N.J. at 453-54 (holding termination of the defendant's parental rights would not do more harm than good

where the child's attachment to the resource parent was stronger than the child's attachment to the legal parent); N.J. Div. of Child Prot. & Permanency v. N.C.M., 438 N.J. Super. 356, 372-73 (App. Div. 2014) (concluding the Division satisfied the fourth prong with expert testimony that the children had developed a "secure[] attach[ment]" to their resource parent but had only an "insecure attachment" to their legal parent).

Our Supreme Court has explained that "[t]o satisfy the fourth prong, the State should offer testimony of a well[-]qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the [resource] parents." F.M., 211 N.J. at 453 (quoting M.M., 189 N.J. at 281). An important factor under the fourth prong, is "[a] child's need for permanency," ibid. (alteration in original) (quoting M.M., 189 N.J. at 281), because "a child has a right to live in a stable, nurturing environment and to have the psychological security that his [or her] most deeply formed attachments will not be shattered," ibid.

We first address the termination of Meg's parental rights to Jason, Jacob, and Heather, and the termination of Randall's parental rights to Jacob and Heather, because those children were in pre-adoptive homes at the time of trial, and we have not been advised those circumstances changed following the

guardianship order. We next consider the termination of Meg's parental rights to Karen and Jasmine because the parties do not dispute that Karen's and Jasmine's placements changed following the trial, and we have pending before us Meg's motion to remand the case to the trial court for reconsideration of the judgment of guardianship as to Karen and Jasmine.

The evidence supports the court's finding the Division clearly and convincingly established the termination of Meg's parental rights to Jason, Jacob, and Heather, and Randall's parental rights to Jacob and Heather, will not do more harm than good. The court accepted Dr. Stilwell's testimony that although Jason and Jacob had attachments to Meg, they did not view her as their parental figure, and they each had a secure relationship with their resource parents, who they viewed as their psychological parents and who are committed to adoption. Dr. Stilwell explained Jason and Jacob would both suffer severe and enduring harm if their relationships with their resource parents were severed and that Meg is unable to mitigate the harm they will suffer if their respective relationships with their resource parents end because Meg continues to be unable to safely parent them.

Dr. Stilwell similarly testified that Jacob has a "familiarity" with Randall, but Jacob did not view Randall as a primary attachment figure. Dr. Stilwell

A-2802-19

explained that Jacob views his resource parent as a "significant and central parental figure," and considers his resource parent his psychological parent. According to Dr. Stilwell, termination of Randall's parental rights would cause a minimal disruption in Jacob's life, but termination of his relationship with his resource parent would result in severe and enduring harm to the child. The evidence also demonstrated Randall is unable to mitigate any harm caused by the termination of Jacob's relationship with his resource parent because Randall is incapable of safely parenting the child and will remain incapable in the foreseeable future.

Dr. Stilwell noted that Meg's and Randall's respective absences in Heather's life due to their respective inabilities to properly parent the child support the conclusion that Heather does not have a secure bond with either of her parents. Dr. Stilwell further reasoned that Heather enjoys a significant attachment to her resource parent who has cared for, nurtured, and provided a home for the child since her birth. See, e.g., I.S., 202 N.J. at 182 (finding expert testimony based on a comparison of bonding evaluations is not required in an instance involving a "common sense notion that [a] child will be more bonded with his [or her resource] parents than with [the] defendant"); see also N.C.M., 438 N.J. Super. at 372-73 (finding an expert's unrebutted opinion that the

children were "securely attached" to the resource parent but had an "insecure attachment" to the parent proved prong four).  Moreover, and again, neither Meg nor Randall can mitigate the harm that will befall Heather if her relationship with her resource parent ends because they each remain incapable of properly parenting their children.  See B.G.S., 291 N.J. Super. at 593 (noting a child's need for permanency and a parent's inability to provide a safe and secure home for the child in the foreseeable future support a finding that termination of parental rights will not do more harm than good).

We separately address the court's finding the Division clearly and convincingly established that termination of Meg's parental rights to Karen and Jasmine will not do more harm than good.  Meg and the Law Guardian for Karen and Jasmine first contend the evidence presented at trial did not support the court's finding.

Based only on the evidence presented at trial, we would conclude the court's determination that the termination of Meg's parental rights would not do more harm than good is again supported by the testimony of Dr. Stilwell, who the court found credible.  She testified that, based on her bonding evaluations, Meg had relationships with Karen and Jasmine that were insecure; Karen and Jasmine were developing strong relationships with the resource parents with

A-2802-19

whom they had been residing for a few months; and termination of Meg's parental rights would provide Karen and Jasmine with an opportunity for permanency which Meg did not offer, and would be incapable of providing for the foreseeable future. Dr. Wells offered a different view of Karen's and Jasmine's respective relationships with Meg, but the court found Dr. Stilwell's testimony more credible and persuasive. Thus, if our decision concerning the Division's proofs on the fourth prong was limited to the trial evidence, we would discern no basis to reverse the court's determination.

In her pending motion to supplement the record and vacate the guardianship order, Meg contends that a remand is required for reconsideration of the court's finding on the fourth prong as to Karen and Jasmine. Meg claims that an important factor in the court's analysis of the fourth prong—the putative permanency of a resource home committed to adoption—is no longer extant. As noted, subsequent to the entry of the guardianship order, Karen and Jasmine were removed from the resource home committed to adoption in which they resided at the time of trial and were placed in separate resource homes. Karen was later moved twice to new placements.

We agree with Meg that it is appropriate to vacate the guardianship order as to the court's prong four determination as to Karen and Jasmine. The trial

court's finding on prong four as to those two children is founded in part on the permanency that Karen's and Jasmine's then-resource parents offered through their commitment to adopt the children. In its balancing of the effects of a termination of Meg's parental rights to the children, the court noted that any harm either child might suffer from the termination of their relationship with Meg "would be mitigated by continued therapy and the presence of their resource parents." The putative permanency offered at the time by Karen's and Jasmine's resource parents was essential to the court's determination the Division satisfied its burden under the fourth prong. Indeed, Dr. Stilwell testified in part that termination of Meg's parental rights to the children would not do more harm than good because of the stability and security that was to be provided by the putative adoptive parents. Moreover, it was the absence of a resource home committed to adoption for Zack, and his limited prospects for a select home adoption, that caused the court to conclude the Division failed to sustain its burden under prong four as to Meg and him.

Karen's and Jasmine's placements subsequent to the entry of the guardianship order require a reexamination of the fourth prong as to Meg and the two children. The current record, even as supplemented by Meg's motion, does not provide the reasons for the changes in placement, the children's status

in their current placements, their prospects for adoption with their current resource parents or otherwise, or the Division's permanency plan based on the children's current circumstances. That information is essential to a determination whether, based on the children's changed circumstances, the termination of Meg's parental rights will cause the children more harm than good.

We are mindful Karen and Jasmine have been in placement for many years and "a child's need for permanency is an extremely important consideration pursuant to" the fourth prong. R.G., 217 N.J. at 559. The evidence established Meg's longstanding parental unfitness and that she will be unable to properly parent the children in the foreseeable future. Termination of parental rights based on parental unfitness, and not on a child's bond with his or her resource family, requires a prong four determination of the child's need for permanency and the parent's ability—or inability—to provide the child with a safe and stable home "in the foreseeable future." B.G.S., 291 N.J. Super. at 593. But it is "recognized that terminating parental rights without any compensating benefit, such as adoption, may do great harm to a child." E.P., 196 N.J. at 109. The harm may result "when a child is cycled through multiple [resource] homes after a parent's rights are severed," ibid., and that harm "may be greater than keeping

A-2802-19

the parent-child relationship intact since the child's psychological and emotional bond to the parent may have been broken with nothing substituted in its place," ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J 591, 611 (1986)).

"A court should hesitate to terminate parental rights in the absence of a permanent plan that will satisfy the child's needs." B.G.S., 291 N.J. Super. at 593; see A.W., 103 N.J. at 611 (acknowledging the "unfortunate truth that not all children, who are 'freed' from their legal relationship with their parents, find the stable and permanent situation that is desired even though this is the implicit promise made by the State when it seeks to terminate the parent-child relationship" (quoting In re Angelia P., 623 P.2d 198, 210 (Cal. 1981))). We hesitate here because we cannot properly determine for the first time on appeal that termination of Meg's parental rights will not do more harm than good where we lack evidence and a full record concerning the significant change in circumstances concerning the children's respective placements and their current prospects for permanency through adoption. We also cannot affirm the termination of Meg's parental rights because both children have bonds, albeit insecure ones, with Meg, and the record as supplemented permits only a determination that the promise of permanency with the children's former

resource parents, which the court found essential to its prong four determination, has been unfulfilled.[13]  The court must consider the entire record, as well as any evidence related to the circumstances following entry of the guardianship order, to properly determine whether the Division has clearly and convincingly established termination of Meg's parental rights to each child, with or without the child's placement in an adoptive home, will not do more harm than good.

We therefore vacate the guardianship order terminating Meg's parental rights to Karen and Jasmine.  We remand for the court to determine whether the termination of Meg's parental rights to Karen and Jasmine will not do more harm than good under N.J.S.A. 30:4C-15.1(a)(4).[14]  The court shall allow such discovery and expeditiously conduct such proceedings it deems appropriate to make the determination.  The court shall make separate prong four determinations as to Karen and Jasmine based on the evidence presented.  If the court determines termination of Meg's parental rights will not do more harm than good as to a child, the court shall enter a final guardianship order as to that

---

[13]  We note Karen testified at trial that she preferred residing with Meg, if she could obtain housing, over the then-intended adoption by her resource parents.

[14]  As noted, we affirm the court's findings the Division clearly and convincingly established prongs one, two, and three as they relate to the termination of Meg's parental rights to Karen and Jasmine.

A-2802-19

child. If the court determines the Division failed to sustain its burden to clearly and convincingly satisfy prong four as to a child, the court shall enter an order dismissing the Division's complaint for guardianship as to that child.

In sum, we affirm the guardianship order terminating Meg's parental rights to Jason, Jacob, and Heather, and terminating Randall's parental rights to Jacob and Heather. We affirm the court's determination the Division carried its burden of presenting clear and convincing evidence establishing the first three prongs of the best-interests standard supporting the termination of Meg's parental rights to Karen and Jasmine. We vacate the guardianship order as to the termination of Meg's parental rights to Karen and Jasmine, and remand for reconsideration of the fourth prong of the best-interests standard as to Karen and Jasmine in light of the information concerning their changed placements that was provided following entry of the guardianship order and for which we have granted leave to supplement the record on appeal. On remand, the court shall permit and conduct such proceedings and hearings it deems appropriate to allow the parties to fully address the circumstances relevant to a proper consideration of the fourth prong of the standard. Nothing in this opinion shall be construed as an opinion on the merits of the issues to be addressed on remand.

Affirmed as to A-2805-19.  As to A-2802-19, affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.[15]

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[15]  As to M-2543-20, we grant the motion to supplement the record.  Given our disposition of the appeal on the merits, we deny as moot Meg's motion to vacate the guardianship order as to Karen and Jasmine and remand for further proceedings.  We shall enter a separate order reflecting our disposition of the motion.